**Leah A. Johnson, OSB #972647**
**ljohnson@gnslawgroup.com**
Gilroy | Napoli | Short Law Group
12755 SW 69th Avenue, Suite 200
Portland, Oregon 97223
Telephone: (503)747-7198
Facsimile: (503)747-2951

Attorney for the Plaintiff Coen Poelmann

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **COEN POELMANN**,<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF EUGENE,** a Local Government in Oregon, **EUGENE POLICE DEPARTMENT, CHIEF CHRIS SKINNER, OFFICER IAN AARTS,** and **OFFICER ANDREW ROBERTS,**<br><br>Defendants. | Case No: 6:24-cv-01966-MTK<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **ANDREW ROBERTS** and **IAN AARTS,**<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>**COEN POELMANN,**<br><br>Third-Party Defendant. | |

## I. INTRODUCTION

Mr. Poelmann, Plaintiff, opposes Defendants' Motion for Partial Summary

Judgment. Mr. Poelmann submits evidence in the response that will show Officers Aarts and Roberts' use of force was excessive and that they are not entitled to qualified immunity. The Defendants' motion should be denied.

## II. FACTUAL BACKGROUND

As stated in Defendants' Motion for Partial Summary Judgment, much of the evidence in this case is from the body worn cameras (BWC) of the officers, including Defendants, on the scene on October 15, 2022. Plaintiff will be referencing the Declarations and BWCs previously submitted by the Defendants. Plaintiff will also note the running time on the videos instead of the time stamp, as the defendants have done.

On October 15, 2022, close to 1:00 a.m., Coen Poelmann left a fraternity house in the University District around the University of Oregon. As he was leaving the house, someone handed him what he believed to be an empty can of alcohol. Declaration of Coen Poelmann in Opposition to Defendants' Motion for Partial Summary Judgment ("Poelmann Decl.") ¶ 3. He was speaking on his cell phone with his girlfriend and not especially paying attention to the interaction when the person at the fraternity handed him the can. Poelmann Decl. ¶4.

Mr. Poelmann began to walk home along Hilyard Street. As he approached the intersection with E. 14th Avenue, Defendants Aarts and Roberts, officers with the Eugene Police Department, were waiting for him. Declaration of Andrew Roberts in Support to Defendants' Motion for Partial Summary Judgment ("Roberts Decl.") Exhibit 1 ("Roberts BWC") at 00:30. They had just finished a stop with another college-age suspect that had resulted in the suspect being tackled in the middle of the street. Declaration of Leah Johnson in Opposition to Defendants' Motion for Partial Summary Judgment ("Johnson Decl."), ¶2, Exhibit 1, Deposition of Ian Aarts ("Aarts Depo.") at 43:9-44:10 and 44:23-45:20. Officer Roberts said he had been injured from that encounter and was "still shaking" just prior to meeting Mr. Poelmann. Roberts Depo at 36:7-36:10 and 42:1-42:9. Officer Roberts testified he was still trying to catch his breath

from the previous encounter when he began his interaction with Mr. Poelmann. Roberts Depo. at 42:6-42:14.

Officer Robert's told Mr. Poelmann, "Stop, stop." Roberts BWC at 00:30. Mr. Poelmann was still talking on his phone, but when he realized the officer was addressing him, he stopped walking within three seconds of the initial order. Roberts BWC at 00:33. Officer Aarts then rapidly explained who he was and why he was stopping Mr. Poelmann. Roberts BWC at 00:50-00:55. In his deposition, Officer Aarts agreed that he has a habit of speaking quickly. Declaration of Leah Johnson in Opposition to Defendants' Motion for Partial Summary Judgment ("Johnson Decl."), ¶3, Exhibit 2, Deposition of Ian Aarts ("Aarts Depo.") at 54:13-54:16. Officer Aarts told Mr. Poelmann that he would be getting a citation for an "MIP." At no point in the conversation did either officer explain what "MIP" meant. Aarts Depo. at 48:16-48:19. Poelmann Decl. ¶6.

Officer Aarts continued speaking with Mr. Poelmann, saying he could smell alcohol on Mr. Poelmann's breath. Mr. Poelmann was not slurring his words, although Officer Aarts claimed that he was. Declaration of Florian Aarts in Support to Defendants' Motion for Partial Summary Judgment ("Aarts Decl.") Exhibit 1 ("Aarts BWC") at 00:59-01:20. He also said to Mr. Poelmann "…and there's alcohol in your body, right?" Aarts BWC at 01:08. At this point Mr. Poelmann became confused and believed he was being investigated for "being drunk." Poelmann Decl. at ¶5. Mr. Poelmann asked for an 'alcohol test.' Aarts BWC at 01:15. Mr. Poelmann and Officer Aarts begin a back and forth dialogue with Mr. Poelmann asking, "was I drinking," and Officer Aarts responding with, "what's your name." Aarts BWC at 01:42-01:46. After the second time asking for Mr. Poelmann's name, Officer Aarts throws his pen and citation book to the ground and says, "Okay. We'll do it the hard way," while reaching out to grab Mr. Poelmann. Aarts BWC at 01:47. Seventy-seven seconds elapsed between the initial order to stop and the officers grabbing Mr. Poelmann.

/ / /

Without further explanation of what was happening, Office Aarts began yelling at Mr. Poelmann after he grabbed him saying that he's "resisting arrest." Aarts BWC at 01:48. One second had elapsed from the time officers grabbed Mr. Poelmann and Officer Aarts was yelling that Mr. Poelmann for "resisting arrest." Officers Roberts and Aarts had Mr. Poelmann on the ground four seconds later. Aarts BWC at 01:52.

Mr. Poelmann did not understand that he was being arrested, and the officers did not explain that to him. Poelmann Decl, ¶¶ 7 and 8.

> Q. Prior to grabbing Mr. Poelmann did you tell him he was under arrest?
> A. No.
> Q. Did you give him an opportunity to put his hands behind his back?
> A. No.
> Q. Did you tell him you were going to arrest him?
> A. No.

Aarts Depo. at 49:25-50:9.

> Q. Is it fair to say that you and/or Officer Roberts had already grabbed him when you said, "You're under arrest"?
> A. From my recollection, kind of -- watching the video, kind of simultaneous as we're grabbing we're telling him he's under arrest just so he knows what's happening, that we're not just assaulting him or something. We were effecting a lawful arrest.
> Q. Did you explain to him what that meant?
> A. Explain what to him?
> Q. That -- what it meant to be arrested?
> A. No.

Aarts Depo. at 51:8-51:19

Both Officers testified that in the eighty-one seconds they interacted with Mr. Poelmann before having him on the ground, Mr. Poelmann did not raise his hands at them. Mr. Poelmann did not threaten the officers, put his hands in his pockets, or try to flee. Roberts Depo. at 55:16-56:6; Aarts Depo. at 47:9-47:19

Once the defendants had Mr. Poelmann on the ground, both officers were yelling at Mr. Poelmann and he did not understand what was happening. Mr. Poelmann was yelling for help,

telling the Officers he didn't understand what was happening, assuring the officers he was "trying to help them," and asking what he was supposed to do. Aarts BWC at 02:12-02:49. After he was handcuffed behind his back, Officer Roberts continued to hold on to Mr. Poelmann's hair and press his head against the cement sidewalk with his upper body. Aarts BWC at 02:58-03:08.

Mr. Poelmann was instructed to roll over, sit up, and then stand, which he did. Aarts BWC at 03:54-04:04. He was calm and cooperative. Officer Roberts then grabbed Mr. Poelmann by the hair, pulled him towards a police SUV, and pushed him face down on the hood even though officers already had control of him. Aarts BWC at 04:10-04:42. Multiple additional officers had arrived at the scene while Mr. Poelmann was being arrested and were attempting to control the large crowd of college-age bystanders. Multiple officers were yelling at Mr. Poelmann while he was expressing a willingness to cooperate and being confused about what was going on.

The situation continued to escalate with officers and bystanders yelling as officers took Mr. Poelmann to the back of the police SUV. Again, Officer Roberts pulled his hair to force Mr. Poelmann to the back of the police SUV and then Officer Roberts slammed Mr. Poelmann's head against the side of the vehicle. Aarts BWC at 04:52-04:53. Mr. Poelmann pushed back from the SUV and he was thrown to the ground by Officer Roberts where multiple officers converged. Officer Roberts then said that Mr. Poelmann had spit on him. Aarts BWC at 05:19.

Officer Aarts testified that he did not see Mr. Poelmann spit on Officer Roberts, nor did he observe any saliva on Officer Robert's face. Aarts Depo. 65:5-65:17. Mr. Poelmann denies spitting on Officer Roberts. Johnson Decl, ¶12, Exhibit 11, Deposition of Coen Poelmann ("Poelmann Depo.") at 43:19-43:25. The officers then placed a "spit hood" over Mr. Poelmann's head and bound his feet with a flexible restraint device. This consisted of a zip tie on each of Mr. Poelmann's ankles, then a strap from his bound ankles, up along his back, and attached to the handcuffs on his wrist. The connecting strap was short enough to pull Mr. Poelmann's bent legs behind his back. Aarts BWC at 05:23-06:18. The officers carried Mr. Poelmann face down and

pushed him headfirst into the back seat of the police SUV. Mr. Poelmann told the officers that the restraints were hurting him, but none of the officers checked the restraints to see if they were too tight. Roberts BWC at 07:15.

Officer Kevin Bunday transported Mr. Poelmann to the jail booking facility. When Officer Bunday opened the rear of the police SUV at jail intake to remove Mr. Poelmann, he was sitting up, but with a blue strap hooked around his neck. Declaration of Kevin Bunday in Support to Defendants' Motion for Partial Summary Judgment ("Bunday Decl.") Exhibit 1 ("Bunday BWC") at 37:39. The restraints on Mr. Poelmann were so tight that Officer Bunday struggled to remove the flexible restraint device and noted that the handcuffs were very tight, stating, "Yeah, these are on really tight…" Bunday BWC at 40:41. Mr. Poelmann was pleasant, apologetic, and cooperative at booking. Mr. Poelmann had a spit hood on his head and his ankles and wrist bound together along his back for nearly 40 minutes. Aarts BWC at 05:23 to Bunday BWC at 40:20.

Mr. Poelmann was injured by Officers Roberts and Aarts. He had large abrasions and bruises on his forehead, cheek, jaw, chest, and shoulder from being held against the sidewalk. His jaw was injured and he could not eat solid food for two to three weeks. He also had two cracked teeth. Johnson Decl, ¶10, Exhibit 9, Photographs of Mr. Poelmann's injuries ("Poelmann Photos"); Poelmann Depo. at 70:15-70:20.

## III. LEGAL ARGUMENT

### A. Summary Judgment Standard

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir 2013) (internal quotation marks omitted). "An

issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir 2010) (internal quotation marks omitted). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *Gordon v. County of Orange*, 6 F.4th 961, 967 (9th Cir. 2021). All reasonable doubt as to the existence of a genuine issue of facts should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1982).

The reasonableness of force used is ordinarily a question of fact for the jury. *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (alteration in original) (internal quotation marks omitted) *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011).

**B. Officer Aarts and Officer Roberts Used Excessive Force Against Mr. Poelmann**

42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the United States Constitution or statutory law, and (2) that the deprivation was committed by a person acting under color of law. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

"When evaluating a claim of excessive force, Courts consider three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to

evade arrest by flight.'' *Williams v. City of Sparks*, 112 F.4th 635, 643 (quotation marks and brackets removed). (quoting Graham v. Connor, 490 U.S. 386, 387 (1989)).

"Of the Graham factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826-28 (citing *Smith v. City of Hemet,* 394 F.3d 689 (9th Cir. 2005)). The Fourth Amendment requires police to use only an amount of force that is objectively reasonable under the circumstances facing them at the time." *Graham v. Connor*, 490 U.S. 386, 387 (1989). Unreasonable uses of force are unconstitutional. *Id.*

In the Defendants' Motion for Partial Summary Judgment, they do not address any of the Graham factors in relation to Mr. Poelmann's actions. The legal standard for evaluating excessive force is clearly set out in their motion, but they make no attempt to dispute Mr. Poelmann's claim that the force was excessive in the context of Mr. Poelmann's stop.

**1. The Severity of Mr. Poelmann's Alleged Crime Was Minor.**

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle v. Rutherford*, 272 F.3d 1272 at 1280 (9th Cir. 2001). Mr. Poelmann was originally stopped for "Minor in Possession of Alcohol," commonly referred to as an MIP, a Class B violation. ORS 471.430 (4)(a)[1]. He was ultimately arrested under Eugene Municipal Code 4.190(1)[2] for having an open container of alcohol in public, a Class A misdemeanor. Neither the violation nor the crime are dangerous acts or a threat to others. Mr. Poelmann ultimately was not convicted of any crimes. The Lane County District Attorney

[1] ORS 471.430 provides: "(1) A person under 21 years of age may not attempt to purchase, purchase or acquire alcoholic beverages. Except when a minor is in a private residence accompanied by the parent or guardian of the minor and with the parent's or guardian's consent, a person under 21 years of age may not have personal possession of alcoholic beverages…(4)(a) Except as provided in paragraph (b) of this subsection, a person who violates subsection (1) or (3) of this section commits a Class B violation."

[2] Eugene Municipal Code 4.190 provides: "(1) Except as provided in subsections (2), (3), and (4) of this section, consumption of alcoholic liquor or possession of an open alcoholic beverage container is prohibited in a public place and on private property extended to the public for use, and no person shall drink, consume alcoholic liquor, or possess an open alcoholic beverage container in such a place or on such property, unless authorized by the Oregon Liquor Control Commission or other provisions of this code."

declined to prosecute Mr. Poelmann and referred the case to the Eugene City Attorney for possible municipal charges. Johnson Decl., ¶7, Exhibit 6. Mr. Poelmann had a deferred prosecution of the Minor in Possession charge which he successfully completed and all charges were dismissed.

**2. Mr. Poelmann Did Not Pose an Immediate Threat to Officer Aarts and Officer Roberts.**

Officer Aarts and Officer Roberts both testified that they did not perceive Mr. Poelmann to be a threat to them. He was walking alone with both hands visible, one holding his phone and the other holding the can. He did not threaten the officers, nor make any attempt to flee the initial encounter.

> An analogous case, *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), is instructive. There, the officers reasonably believed that Blankenhorn was a misdemeanor suspect for trespassing. *Id.* at 468-69. When the officers confronted him, Blankenhorn became angry and agitated, but was nonviolent. *Id.* The officers ordered him to his knees to be handcuffed, but he did not comply. *Id*. In response, three officers gang-tackled him, took him to the ground, and after the officers were on top of him an officer punched him in the head and body. *Id*. at 469-70. The officers handcuffed Blankenhorn and put him in hobble restraints. *Id.* at 469. The circuit court held that the officers' conduct "gang-tackling," use of post-restraint impact blows, and the hobble restraints violated Blankenhorn's Fourth Amendment rights, and the conduct was contrary to "clearly established law." *Id.* at 481.

*Garlick v. Cnty of Kern*, 167 F.3d 1117, 1150 (E.D. Calif. 2016).

Once Mr. Poelmann was on the ground, at no point did he intentionally try to hit, kick, or punch the officers. After being handcuffed, he laid still on the ground, face down. Aarts BWC at 03:10-03:59.

**3. Mr. Poelmann Did Not Actively Resist Officer Aarts and Office Roberts.**

During the initial encounter, Mr. Poelmann did not resist the officers. He handed them the can in his hand and then continued to stand in place and speak with Officer Aarts.

> Active resistance is not to be found simply because of a failure to comply with the full extent of the officers orders…Therefore, even if Nelson heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance.

*Nelson v. City of Davis,* 683 F.3d 867, 882 (2012).

Mr. Poelmann did not immediately give his name when requested by the officers, but passive resistance is not the same as actively resisting an officer. Any disputes regarding Mr. Poelmann's actions are fact questions for the jury.

> The parties dispute whether Silva was passively or actively resistant. "[R]esistance" is not "a binary state," it is better understood as a spectrum "from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan [v. MacPherson]*, 630 F.3d 805, 830 (9th Cir. 2010) (citing *Forrester [v. City of San Diego]*, 25 F.3d 804, 805 (9th Cir. 1994); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130-31 ("*Headwaters II*") (9th Cir. 2002). Taking Plaintiffs' facts as true, Silva remained on the ground and unarmed; never got to his feet; was not fleeing; did not attack any officer; moved defensively; and his physical resistance, if any, was brief. Plaintiffs produce evidence showing a genuine issue of material fact whether Silva's noncompliance constitutes "passive resistance." *Bryan*, 630 F.3d at 829-30.

*Garlick v. Cnty of Kern*, 167 F. Supp 3d 1117, 1150; 2016 LX 66614.

### C. Officer Aarts and Officer Robert Do Not Meet the Standard for Qualified Immunity.

Because Mr. Poelmann has established that the force used by the defendants was excessive or has presented a fact question for a jury regarding the use of force, then the next step in the court's analysis is to **"**determine whether the breached constitutional right was "clearly established." The "clearly established" inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Id.* If the right was not clearly established, then qualified immunity applies. *LeBlanc v. City of Los Angeles,* 2006 U.S. Dist. LEXIS 96768 (9th Cir. 2006)

Defendants cite *Conley v. City of Eugene* for the holding that the officers were entitled to

qualified immunity after grabbing the plaintiff without warning, wrestling with him, attempting to taser him and struggling to apply handcuffs. *Conley v. City of Eugene*, Case No. 6:22-cv-01144-MTK, 2025 U.S. Dist. LEXIS 1012976*27-31 (D. Or. May 30, 2025). Their reliance on *Conley* is misplaced because of the officer safety issues in the *Conley* case. Specifically, the plaintiff was a diagnosed schizophrenic, in a mental health crisis, naked, and was being investigated for a domestic violence charge, including the plaintiff holding a knife. None of those potential officer safety issues are relevant to the case at bar.

**1. The Defendants Used Excessive Force to Take Down Mr. Poelmann.**

Mr. Poelmann was speaking with Officers Aarts and Roberts when, without warning or explanation, they grabbed him and took him face-first to the ground. Officer Aarts said in his deposition that simultaneous to grabbing Mr. Poelmann, they were telling Mr. Poelmann he was under arrest "…just so he knows what's happening, that we're not just assaulting him or something." Aarts Depo. at 51:8-51:15. Within one second of grabbing him, Officers Aarts and Roberts were also yelling at Mr. Poelmann that he was resisting arrest.

The Ninth Circuit has held that a forcible take-down in the context of passive resistance, when plaintiff did not voluntarily give officers his driver's license, was excessive force and the officers were not entitled to qualified immunity. *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021).

> Rice explained in his declaration that he was tripped and "forcibly" thrown to the ground, face-first onto the pavement. Due in part to the take-down, Rice declared that he suffered "extreme pain" immediately following his arrest and long-term physical pain for which he received medical treatment. Thus, assuming Rice's version of the material facts viewed in the light most favorable to him, see Tuuamalemalo, 946 F.3d at 478, we agree with the district court that Morehouse and Shaffer's take-down involved a "substantial" and "aggressive use" of force. Cf. Santos, 287 F.3d at 853 (describing a take-down maneuver as "quite severe"). Its use, like any, "must be justified by the need for the specific level of force employed." Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2010).

*Rice*, 989 F.3d at 1121.

Throwing Mr. Poelmann to the ground, without any explanation or resistance from him, constituted excessive force.

**2. The Defendants Use of Too Tight Handcuffs Was Excessive Force.**

The handcuffs were placed on Mr. Poelmann so tightly by Officers Aarts and Roberts that Officer Bunday struggled to get them to release. The cuffs had been on for approximately 40 minutes. Mr. Poelmann repeatedly told officers that the restraints, including the handcuffs, were hurting him. The Ninth Circuit has held that officers are not entitled to qualified immunity in cases similar to Mr. Poelmann's claim. *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (holding that officer who fastened handcuffs so tightly around plaintiff's wrist that it caused pain and left bruises for weeks was not entitled to qualified immunity).

> A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force. See, e.g., *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993); *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989). The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses. According to the facts alleged by LaLonde, it is difficult, if not impossible, to say that the only reasonable conclusion that the evidence permits is that the force used was reasonable; therefore, this aspect of the case should also have gone to the jury. *Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998)"

*LaLonde v. County of Riverside,* 204 F.3d 947, 960 (9th Cir. 2000)

If the defendants take the position that the handcuffs were not too tight or did not rise to the level of excessive force, then that is a jury question.

**3. Employing the Spit Hood Can Constitute Excess Force.**

The Eugene Police Department has a specific policy for applying spit hoods: Eugene Police Department Policy 811.2[3] Decl. Johnson ¶8, Exhibit 7. It states that a spit hood shall be used on, "(a)ny subject who demonstrates spitting behavior, or who threatens or attempts to spit on someone…" Mr. Polemann did none of those things.

[3] Eugene Police Department Policy 811.2 "Any subject who demonstrates spitting behavior, or who threatens or attempts to spit on someone, should have a department-issued spit hood placed over their head and face…"

Officer Roberts stated that Mr. Poelmann spit on him. Officer Aarts did not see this happen and did not observe saliva on Officer Roberts. Mr. Poelmann denies he ever spit on Officer Roberts. The Lane County District Attorney's Office declined to prosecute the charge of aggravated harassment under ORS 166.070(c)[4] (spitting on an officer). Johnson Decl. ¶7, Exhibit 6.

The department policy does not, of course, put the defendants on notice that it may be a violation of a constitutional right if a spit hood is employed. There are, however, cases that consider the use of a spit hood in the overall course of officer conduct.

In *Dennison v. Lane* 2013 U.S. Dist. LEXIS 15026, the plaintiff was taken down by a leg sweep and struggled. He was then handcuffed and, "(l)eg restraints were also put on plaintiff until a body restraint device was placed on him, *including a spit hood*." *Dennison* at 6. (*ital.* added). The *Dennison* court held, without specifically referencing any particular use of force (handcuffs, spit hood, etc), that, "Plaintiff has adequately alleged a violation of a clearly established constitutional right, in that a reasonable person in defendants' positions would not have believed that it was lawful to force to the ground, punch many times and fully restrain plaintiff for simply requesting to make a phone call. See *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (finding no qualified immunity where law was clearly established at time of defendant's arrest that arresting officers' conduct in punching, gang tackling, and using hobble restraints to take defendant into custody could have been unconstitutional)." *Dennison* at 20.

> This Court may rely on a District Court opinion to satisfy the notice requirement of qualified immunity. "[B]ecause resolving whether the asserted federal right was clearly established presents a pure question of law, the court is not aware of any reason it should not draw on its full knowledge of relevant precedent in laying a strong foundation at the trial court level, rather than restricting its review to cases identified by plaintiff.") (internal quotation marks and citation omitted). The

[4] ORS 166.070(b) A person commits the crime of aggravated harassment if the person, knowing that the other person is a: (c) Public safety officer, intentionally propels saliva at the public safety officer, and the saliva comes into physical contact with the public safety officer, while the public safety officer is acting in the course of official duty or as a result of the public safety officer's official duties.

> Court may also look at unpublished decisions. See *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir. 2019) ("[W]e may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent.") (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)).

*Estate of Wilson by & through Jackson v. Cnty. of San Diego*, 729 F Supp 3d 1039, 1045–46 (SD Cal 2024).

**4. It was Excessive Force for the Defendants to Use the Flexible Restraint Device**

The Eugene Police Department's name for the strap that connects tied ankles to cuffed hands is a bit of a misnomer: it is "flexible" in one sense, but it is extremely restrictive in application. It is made of a webbing strap that can be hooked between the legs and hands, limiting an arestee's ability to stand or straighten their back or knees. After Officer Roberts grabbed Mr. Poelmann by the hair and slammed him against the rear passenger door of the police SUV, Mr. Poelmann reacted by pushing away from the car. He was then thrown to the ground, and Officer Roberts put the spit hood over Mr. Poelmann's head. Officer Aarts, in the meantime, had his knee in the middle of Mr. Poelmann's spine while putting restraints on Mr. Poelmann's legs and attaching them by the short strap to Mr. Poelmann's hands, cuffed behind his back. Roberts BWC at 05:05- 06:23.

The defendants assert that the *Blankenhorn* case "does not forbid the use of such restraints." Defendants' Motion for Partial Summary Judgment at page 10, citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007). But the *Blankenhorn* Court was clear that whether the use of hobbles was excessive or not is a fact-specific inquiry.

> According to Blankenhorn, the arresting officers gave no warning that they were going to arrest him before gang-tackling him and later applying hobble restraints. Indeed, as the video shows, Nguyen did not even attempt to handcuff Blankenhorn before he, Ross, and South -- as if by predetermined signal -- simultaneously took hold of and wrestled him to the ground. The lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon Blankenhorn could reasonably be considered "provocative," triggering Blankenhorn's limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable.

*Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007).

The *Blankenhorn* Court ultimately held that a jury could find the officers' use of the hobble restraint was excessive and that the involved officers were not entitled to summary judgment on the Fourth Amendment claim because the officers had fair notice that the use of hobble restraints could be excessive. *Id.* at 480, 481.

## IV. CONCLUSION

Officers Aarts and Roberts took Mr. Poelmann to the ground, face-down, put handcuffs on him that were too tight, hog-tied him, put a spit hood over his head, and left him like that was about 40 minutes. The use of was excessive given the totality of circumstances. The Officers are not entitled to qualified immunity because they knew or should have known that their actions constituted excessive force and violated Mr. Poelmann's constitutional rights under the Fourth Amendment. Defendants' Motion for Partial Summary Judgment should be denied.

DATED this 24th day of April 2026.

**GILROY | NAPOLI | SHORT**

By: s/ Leah A. Johnson
Leah A. Johnson, OSB #972647
ljohnson@gnslawgroup.com
Telephone: (503) 747-7198
Facsimile: (503) 747-2951

Attorney for plaintiff

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of April, 2026, I served or caused to be served a true and complete copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** on the party or parties listed below as follows:

**X** Via CM / ECF Filing

______ Via First Class Mail, Postage Prepaid

______ Via Email *bmiller@eugene-or.gove

______ Via Personal Delivery

Ben Miller
Eugene City Attorney's Office
500 E 4th Avenue, Suite 301
Eugene, OR 97401

Of Attorneys for Defendants

**GILROY | NAPOLI | SHORT**

By: s/ Leah A. Johnson
Leah A. Johnson, OSB #972647
ljohnson@gnslawgroup.com
Telephone: (503) 747-7198
Facsimile: (503) 747-2951

Attorney for plaintiff