IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

COEN POELMANN,

Plaintiff(s),

v.

CITY OF EUGENE, EUGENE POLICE DEPARTMENT, OFFICER IAN AARTS, CHIEF CHRIS SKINNER, and OFFICER ANDREW ROBERTS,

Defendant(s).

Case No. 6:24-cv-01966-AP

**OPINION & ORDER**

POTTER, United States Magistrate Judge:

Plaintiff Coen Poelmann filed this case against Eugene Police Officers Ian Aarts and Andrew Roberts (Defendants) asserting a single claim for federal civil rights violations as well as claims arising under state tort laws following his October 2022 arrest.[1] Before the Court is Defendants' Motion for Partial Summary Judgment. Defendants argue that summary judgment is appropriate on Plaintiff's claim for excessive force under the Fourth Amendment due to qualified immunity. For the reasons stated below, Defendants' motion is granted in part and denied in part.

[1] Plaintiff originally included Eugene Police Chief Skinner, the Eugene Police Department, and the City of Eugene as defendants in this action. Chief Skinner was later dismissed from the complaint. Defendants' Motion for Partial Summary Judgment (Defs.' Mot.) 2, ECF No. 26. Additionally, as Defendants point out, the Eugene Police Department is not a proper defendant and is dismissed from the case. *Updike v. Clackamas Cnty.*, No. 3:15-CV-00723-SI, 2015 WL 7722410, at *3–4 (D. Or. Nov. 30, 2015). Finally, Plaintiff is not bringing a claim for municipal liability and has alleged no other claims against the City or any other Defendant. His remaining claims will therefore proceed against only Defendants Aarts and Roberts.

## BACKGROUND

At around 1:00am on October 15, 2022, Plaintiff was walking home alone when he was spotted by Defendants. Compl. ¶ 8, ECF No. 1. At the time, Plaintiff was a student at the University of Oregon. Poelmann Decl. ¶ 2, ECF No. 39. Plaintiff had a can of beer in his hand that someone handed to him as he left a nearby fraternity party to walk home. Poelmann Decl. ¶ 3.

Prior to their encounter with Plaintiff, Defendants had spent the evening assigned to what is colloquially referred to as "party patrol." Compl. ¶ 7; Defs.' Ans. ¶ 6, ECF No. 4. That type of patrol focuses on "violations of noise ordinances, disorderly conduct, open container and similar unlawful behaviors affecting quality of life around the west side of the University of Oregon campus[.]" Defs.' Ans. ¶ 6. Defendants had just finished arresting another college-aged individual when they spotted Plaintiff. Defendants' Motion for Partial Summary Judgment (Defs.' Mot.) 3, ECF No. 26. That arrest ended with "the suspect being tackled in the middle of the street." Johnson Decl. Ex. 2, at 4-5, ECF No. 38 (Aarts Depo.). Defendant Roberts, who had been injured during that arrest, was "still shaking" and catching his breath when the encounter with Plaintiff began. Johnson Decl. Ex. 1, at 4-5 (Roberts Depo.).

Defendants initiated the stop after they saw that Plaintiff appeared to be carrying a beer can. Defs.' Ans. 3, ECF No. 4. Based on that observation, Defendants allege that "[t]hey had probable cause to believe that [Plaintiff] had committed the offense of open container under Eugene Code 4.190[.]" Defs.' Ans. ¶¶ 48-49. Defendant Roberts opened his citation book while Plaintiff was still half a block away and "before any investigation of any kind occurred." Compl. ¶ 8

As Defendants approached Plaintiff,[2] they asked him if the can was open and empty; Defendant Aarts then took the beer can out of Plaintiff's hand and poured out the remaining liquid. Aarts BWC 00:32-00:37; Roberts BWC at 00:37-00:44. Defendants were in uniform and had identified themselves as police officers. Roberts BWC at 00:34-00:38.

Defendants asked Plaintiff for his ID. Aarts BWC 00:35-00:37. Rather than respond to Defendants' question, Plaintiff instead responded simply that there was nothing in the can and that he planned to go ahead and record the incident. Aarts BWC 00:37-00:43. Defendant Aarts informed Plaintiff that it is a misdemeanor crime to lie about his name that he was either going to receive a citation for open container[3] or an MIP,[4] depending on how old he was. Aarts BWC 00:43-00:51. Plaintiff stated that he was 19, to which Defendant Aarts replied that Plaintiff would receive the "MIP" which is just a violation and "no big deal." Aarts BWC 00:51-00:54.

Plaintiff argued that Defendants did not have the right to cite him. Aarts BWC 00:56-1:45; Roberts BWC 1:11-1:45. Plaintiff also insisted that Defendants needed to use a

---

[2] Both Defendants were wearing body cameras during the encounter, and the entire incident was caught on video. Aarts Decl. Ex. 1, ECF No. 33 (Aarts BWC); Roberts Decl. Ex. 1, ECF No. 36 (Roberts BWC).

[3] Eugene Municipal Code 4.190 provides: "(1) Except as provided in subsections (2), (3), and (4) of this section, consumption of alcoholic liquor or possession of an open alcoholic beverage container is prohibited in a public place and on private property extended to the public for use, and no person shall drink, consume alcoholic liquor, or possess an open alcoholic beverage container in such a place or on such property, unless authorized by the Oregon Liquor Control Commission or other provisions of this code."

[4] MIP is shorthand for minor in possession of alcohol, but neither Defendant clarified that in the initial encounter. Oregon Revised Statutes § 471.430 (2023) provides: "(1) A person under 21 years of age may not attempt to purchase or acquire alcoholic beverages…. a person under 21 years of age may not have personal possession of alcoholic beverages…. (4)(a) Except as provided in paragraph (b) of this subsection, a person who violates subsection (1) or (3) of this section commits a Class B violation."

breathalyzer on him before issuing the ticket. Aarts BWC 00:58-1:28. During the conversation, Defendants warned Plaintiff that they could take him to jail for the open container or they could write him an "MIP." Aarts BWC 1:29-1:34. Defendant Aarts told Plaintiff that he had an open container and he was "MIP" because he was 19 and had an open beer while he was walking down the street. Aarts BWC 1:29-1:41.

Defendant Aarts asked for Plaintiff's name three more times. Each time, Plaintiff refused to answer and instead responded by asking whether he had been drinking the beer. Aarts BWC 01:41-1:47; Roberts BWC 1:46-1:50. At that point, Defendant Aarts said that they would do it the hard way, dropped his citation book, announced that Plaintiff was under arrest, and initiated a takedown arrest. Aarts BWC 1:45-1:58; Roberts BWC 1:50-1:52. Once the arrest began, Plaintiff exclaimed "no, no, no" and asked what the officers were doing. Aarts BWS 1:47-1:51. Defendant Aarts told him he was resisting arrest and to stop. *Id.*

Once on the ground, Defendants again told Plaintiff he was under arrest for an open container and to stop tensing his muscles. Aarts BWC 2:09-2:12. Plaintiff continued to struggle and Defendants twice stated that they would use force on him if he did not stop resisting. Aarts BWC 2:12-2:46; Roberts BWC 2:21-2:48. After another minute, Defendants had finished handcuffing Plaintiff and Plaintiff remained lying on the ground. Aarts BWC 3:00-3:12; Roberts BWC 3:21-3:25.

Defendants and other responding officers prepared to move Plaintiff to a squad car. Aarts BWC 3:33-3:38; Roberts BWC 3:38-3:41. Plaintiff continued to argue and stated that he did not understand what was happening. At that point, Defendant Roberts warned Plaintiff that if he did anything other than exactly what he was told, the officers would tie his feet. Aarts BWC 3:41-

3:48; Roberts 3:40-3:53. Defendant Roberts and another officer assisted Plaintiff to his feet and began to move him towards the police vehicle. Aarts BWC 3:52-4:06; Roberts BWC 3:59-4:09.

Once on his feet, however, Plaintiff again attempted to engage with the officers and the growing crowd of onlookers. He demanded that officers give his phone back and resisted moving in the direction of the car. Aarts BWC 4:06-4:10; Roberts 4:10-4:21. In response, Defendant Roberts grabbed Plaintiff's hair to direct him towards the police car. Aarts BWC 4:10-4:18. As they approached the hood of the car to conduct a pat down search, Plaintiff again struggled against the officers and was again told not to resist. Aarts BWC 4:18-4:43.

After conducting a brief search, officers moved Plaintiff towards the back of the patrol car. Plaintiff again attempted to go in a different direction and started yelling about getting his phone back. Aarts BWC 4:43-4:53; Roberts BWC 4:47-4:59. Defendant Roberts again pulled Plaintiff's hair in an effort to direct him into the vehicle and Plaintiff again began screaming. Aarts BWC 4:53-4:59. Defendant Roberts yelled for a spit hood and Plaintiff was thrown to the ground. Aarts BWC 4:59-5:00; Roberts BWC 4:59-5:15. Officers then placed a spit hood on Plaintiff's head and applied the FRD to his legs. Aarts BWC 5:23-6:06. Plaintiff was then transferred to a patrol car while in the restraints. Aarts BWC 6:44-6:57.

Plaintiff was taken to Lane County jail where Defendants "initially cited [him] for multiple crimes" Compl. ¶ 13. Those criminal charges, however, were later dismissed pursuant to a diversion agreement. Compl. ¶ 14; Miller Decl. ¶ 8, Ex. 7.

Plaintiff now asserts that during the moments that led to his arrest, he did not fully understand why he had been stopped by the officers. Poelmann. Decl. ¶ 5. Plaintiff claims that before the night in question, he did not know what an "MIP" was, did not understand the difference between being issued a citation and being arrested, and did not understand the process

of arrest. Poelmann Decl. ¶ 8. Adding to his confusion that night, Plaintiff alleges that Defendants spoke to him "very rapidly and incoherently." Compl. ¶ 9. Plaintiff emphasizes that he was not warned by Defendants that they "intended to use physical force." Compl. ¶ 15. Plaintiff alleges that neither defendant made "any attempts to deescalate the encounter." Compl. ¶ 16.

Now before the Court is Defendants' Motion for Partial Summary Judgment on Plaintiff's excessive force claim. ECF No. 26. Defendants argue that summary judgment is appropriate because they are entitled to qualified immunity. Defs.' Mot. 2.

## STANDARDS

Summary judgment is warranted when, based on the pleadings, depositions, and other interrogatories and admissions on file, together with the affidavits, if any, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case; disputes about irrelevant or unnecessary facts do not preclude summary judgment. *Id.* The materiality of the fact is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Whether there is a genuine issue of material fact is often a close question. *Id.* Thus, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party

cannot merely rely on allegations in the pleadings or claims that it will discredit the moving party's evidence at trial. *Id.* But neither party needs to prove any fact conclusively at this stage. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party and when evidence conflicts, the court "must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.* at 631. At bottom, "if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.*

**DISCUSSION**

**I. Fourth Amendment Excessive Force**

Plaintiff brings his Fourth Amendment excessive force claim under 42 U.S.C. § 1983, which "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The Fourth Amendment protects people against excessive and unreasonable uses of force. *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (citing *Torres v. Madrid*, 592 U.S. 306, 311 (2021)). The use of force on a person by a law enforcement officer is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1060 (9th Cir. 2024) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1998)). If an officer's use of force is excessive, that force exceeds the bounds of what is considered reasonable. Unreasonable force is unconstitutional. *Graham*, 490 U.S. at 387.

In considering claims of excessive force against law enforcement officers, the Court examines the officers' actions "in light of the facts and circumstances confronting them." *Williamson*, 23 F.4th at 1151 (citation omitted). The officer's use of force is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham*, 490 U.S. at 396. "To determine whether an officer's actions were objectively reasonable, [courts] consider: '(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion.'" *Williamson*, 23 F.4th at 1151 (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)).

**II. Qualified Immunity**

An officer is entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). As such, courts must resolve "immunity questions at the earliest possible stage in litigation." *Torres*, 648 F.3d at 1123 (quoting *Pearson*, 555 U.S. at 232).

To determine whether qualified immunity applies, a court must examine: "(1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." *Shafer*, 868 F.3d at 1115 (citing *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (en banc)). A plaintiff must satisfy both parts of the test to defeat a claim of qualified immunity. But the Court need not conclusively determine if an officer violated a protected right

if it is clear that the right had not been clearly established at the time of the incident. *Pearson*, 555 U.S. at 242-43.

Qualified immunity is not analyzed as a "broad general proposition," but rather looks at "the specific context of the case." *Spencer v. Pew*, 117 F.4th 1130, 1138 (9th Cir. 2024) (citation omitted). For a right to be "clearly established," the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). Thus, except in obvious cases, a plaintiff must identify a case that puts the officer on notice that his conduct in the particular case was unlawful. *Spencer,* 117 F.4th at 1138.

When the issue of qualified immunity is raised at summary judgment, the facts must be viewed in the light most favorable to and all reasonable inferences drawn in favor of the plaintiff. *See Gonzalez v. City of Phoenix*, 163 F.4th 1289, 1296 (9th Cir. 2026). The only exception is if a plaintiff's allegations are "blatantly contradicted" by bodycam footage. *Id.* (citation omitted). When the body camera footage establishes the timing and occurrence of events, the Court considers the facts in light of that videotape. *Spencer*, 117 F.4th at 1133.

## III. Defendant's Arrest

Plaintiff alleges that the following four instances of force by Defendants were excessive and therefore unconstitutional: the takedown maneuver, the use of too-tight handcuffs, the use of the spit hood, and the use of the flexible restraint device. Pl.'s Opp. 11-14. Defendants seek summary judgment based on qualified immunity. While Defendants do not concede that they used excessive force, their argument focuses on the second prong of the qualified immunity test; they argue that the rights that were allegedly violated were not clearly established at the time of the incident. Defs.' Mot. 7-11; Defs.' Reply 2.

In a case involving multiple allegations of excessive force in the context of an arrest, an officer may be entitled to qualified immunity for some of his actions but not others.[5] *Spencer*, 117 F.4th at 1142-43 (analyzing the force before handcuffing and the subsequent act of kneeling on the plaintiff separately); *see also Lachance v. Town of Charlton,* 990 F.3d 14, 24-25 (1st Cir. 2021) (discussing the "segmented approach" to analyzing multi-force cases). The Court will thus analyze whether Defendants are entitled to qualified immunity for each alleged use of force.

***A. The Takedown Maneuver***

After Plaintiff was stopped holding an open container of alcohol, he engaged in a back-and-forth with Defendant about whether they could cite him instead of providing his name when asked. Aarts BWC 00:20-1:28. Defendants told Plaintiff he could go to jail for the open container, but he continued to argue. Clearly frustrated, and less than two minutes into the encounter, Defendants took Plaintiff to the ground and announced he was under arrest. During the takedown, Defendants threw Plaintiff face first to the ground, where he sustained physical injuries to his face including abrasions on his jaw. Miller Decl. Ex. 2, ECF No. 28; Compl. ¶ 18.

Due to the considerable degree of contact as well as the risk of resulting harm, the takedown maneuver was an intermediate use of force that amounted to a substantial intrusion. *See Rice*, 989 F.3d at 1121 (finding the officers' use of force substantial when they forcibly threw the plaintiff face-first to the pavement in a takedown maneuver); *cf. Williamson,* 23 F.4th at 1152 (finding the officers' use of force minimal, in part because the officers did not throw the

[5] When multiple officers are involved in an incident, their entitlement to qualified immunity should be analyzed separately. *Spencer*, 117 F.4th at 1145. When one officer is primarily responsible, the question is whether the other officer was an "integral participant." *Id.* In this case, neither party distinguishes the conduct of each officer. Given that, and absent other clear evidence that they should be treated differently, the Court will treat Defendants Aarts and Roberts as integral participants in any violations.

plaintiff to the ground, strike her, or use any compliance techniques for the purpose of inflicting pain on her). This type of force is not always considered excessive; the deciding factor on whether such contact crosses the boundary from reasonable into excessive rests on the government's interest in the amount of force used. Courts weigh the government's interest by considering (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 387; *Williamson*, 23 F.4th at 1153. Other considerations include whether a warning was issued, and if a lesser force alternative was available. *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012). However, "the most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation modified).

*1. The Graham analysis*

First, the crime here was only a minor violation; an open container is a Class A misdemeanor. Second, Plaintiff did not pose an immediate threat to the Defendants' safety. While Plaintiff was verbally combative during the initial encounter, the video makes clear that there were no physical threats made to the officers or others. Aart BWC 00:37-1:45. Indeed, he stopped when he was told to and did not object when the beer can was taken from him and dumped it in the bushes. Aarts BWC 00:32-00:37. Less than two minutes into the encounter, Defendant Aarts decided to "do it the hard way" and commenced the forcible takedown while simultaneously announcing that Plaintiff was under arrest. Aarts BWC 01:47-1:48. This move came in response to Plaintiff's refusal to provide his name, not in response to any show of force or threat by Plaintiff. In fact, Defendants' sudden use of physical force escalated the situation and the threat to officer safety rose accordingly.

Whether Plaintiff's actions amounted to active resistance prior to and during the takedown maneuver requires a more nuanced analysis. Plaintiff did argue with the officers about whether he had committed any crime and repeatedly refused to give his name to officers when they asked. Aart BWC 00:56-1:45. However, this type of resistance is typically considered passive not active. *See, e.g.*, *Nelson*, 685 F.3d at 882 ("Active resistance is not to be found simply because of a failure to comply with the full extent of an officers' orders… this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance.") (citation modified); *Bryan*, 630 F.3d at 830 (construing the plaintiff's refusals to remain in his car, and even his shouting, as relatively passive).

There is also a colorable argument that Plaintiff was not actively resisting when he pulled away from Defendants after being grabbed without warning or explanation. Only one second had elapsed after Defendants grabbed him before Defendant Aarts began yelling at Plaintiff for "resisting arrest." Pl.'s Opp. 4; Aarts BWC at 01:48. Four more seconds elapsed before Defendants took Plaintiff face-first to the ground. Pl.'s Opp. 4; Aarts BWC at 01:52. During that time, Defendants attempted to pull Plaintiff's arms away from his body and Plaintiff exclaimed "ow" and cried, "what are you doing?" Aarts BWC at 01:48-01:52. Given the short amount of time between the start of the encounter and the takedown, Plaintiff's actions at the beginning of his arrest sound less in active-resistance and more within a person's "limited right to reasonable resistance." *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007). Based on these factors, a reasonable jury could find that the force used was excessive and government's interest in the use of such substantial force was minimal.

Against this backdrop, the question becomes whether this level of force—the takedown—was objectively reasonable.

*2. Balancing interests weigh in Plaintiff's favor*

Determining whether the use of force was objectively reasonable requires "balance[ing] between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151 (citation omitted).

This case poses similar balance of interests' questions to those considered in *Rice*. 989 F.3d at 1124. First, in both cases the takedown maneuver amounted to a substantial use of force; both Plaintiffs were forcibly thrown to the ground face-first, causing injury. Second, as in *Rice*, the crime here was a minor violation; an open container is a Class A misdemeanor. Plaintiff did not pose an immediate threat to the Defendants' safety; his failure to comply with Defendants' order reasonably constituted passive resistance; and the officers failed to consider less intrusive alternatives or warn Plaintiff about the use of force. Finally, as in this case, the court in *Rice* held that "a reasonable jury could find that the state's minimal interest in the use of force against Rice did not justify the 'substantial force' used against him." *Id.*

Also, like the plaintiff in *Blankenhorn*, Plaintiff did not immediately submit to the officers' attempts to subdue him but struggled for a few seconds before being taken to the ground. *Blankenhorn*, 485 F.3d at 479. "A person has the limited right to offer reasonable resistance to an arrest…. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct." *Id.* (citation modified). An officer who engages in excessive force is not acting in good faith. *Id.* (citing *United States v. Span*, 970 F.2d 573, 581 (9th Cir. 1992)).

Although officers are not required to use the least amount of force possible, "their failure to consider clear, reasonable and less intrusive alternatives to the force employed militates against finding the use of force reasonable." *Rice,* 989 F.3d at 1124 (citation modified); *see also*

*Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."); *Bryan*, 630 F.3d at 826 ("Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public."). There is no evidence of an immediate need to subdue Plaintiff before attempting less intrusive measures or giving Plaintiff a warning and meaningful opportunity to comply.

The Court finds that a reasonable jury could determine that the Defendants' conduct was unreasonable because they resorted to force without warning and in absence of any immediate threat, active resistance, or an attempt to flee. Because there is a genuine issue of material fact as to whether the Defendants used excessive force in arresting Plaintiff, summary judgment on Plaintiff's claim is "appropriate only if [Defendants] are entitled to qualified immunity on the facts as alleged by [Plaintiff]." *Rice*, 989 F.3d at 1125 (citation modified).

*3. Qualified Immunity for the takedown*

In considering whether the Defendants are entitled to qualified immunity, the operative question is whether Plaintiff's right to be free from being tackled and arrested without warning for a potential nonviolent misdemeanor crime was "clearly established" given the "context of the case." *Thomas v. Dillard*, 818 F.3d 864, 886 (9th Cir. 2016) (citations omitted). The broad protection provided by qualified immunity allows for officers to make "reasonable but mistaken judgments." *Id.* at 887 (citation omitted). Consequently, only those officers who are "plainly incompetent" or those who "knowingly violate the law" are exempted from this doctrine. *Id*. For these reasons, the "statutory or constitutional question" at issue must be "beyond debate." *Id.*

Plaintiff urges the court to draw upon *Rice* here too. In *Rice*, the court found qualified immunity did not apply because the right to be free from substantial force in the implementation of a takedown maneuver was clearly established. 989 F.3d at 1125. "Long before Rice's arrest, we clearly established one's right to be free from the application of non-trivial force for engaging in mere passive resistance." *Id.* (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (citation modified)). The court emphasized that in the case of no resistance or only passive resistance, where a plaintiff has not made any threats to the officer, "the use of non-trivial force of any kind was unreasonable." *Id.* at 1126 (quoting *Gravelet-Blondin*, 728 F.3d at 1094 (citation modified)).

Plaintiff also relies on *Blankenhorn* as being sufficiently analogous to his case. 485 F.3d 463. In *Blankenhorn*, the plaintiff was stopped for a minor crime, did not pose an immediate threat to officer safety, and was not warned that force was imminent before he was tackled. *Id.* The court found qualified immunity did not apply because a reasonable jury could find the officers' tackling the plaintiff was unreasonable under the circumstances. *Id.* at 479. Like this case, the plaintiff in *Blankenhorn* was recorded on video struggling with the officers for a few moments before he was taken down. *Id.* However, the *Blankenhorn* court concluded that "[t]he lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon Blankenhorn could reasonably be considered 'provocative,' triggering Blankenhorn's limited right to reasonable resistance." *Id.* at 479-80.

The Court agrees that this case is sufficiently analogous to *Rice* and *Blankenhorn*. In both cases, the reason for the stop was a minor crime, the plaintiffs did not pose an active threat to safety, all were taken to the ground face-first without warning, and all sustained injuries from the

maneuver. As in *Rice* and *Blankenhorn*, Defendants responded to Plaintiff's passive or minimal resistance—not providing his name immediately—by subjecting Plaintiff to substantial force.

Defendants assert that even if the takedown was an unreasonable use of force, the case law did not place Defendants on notice, pointing to *Roe v. City of Portland,* No. 3:22-CV-01193-SB, 2025 WL 2624534 (D. Or. Sept. 11, 2025). The takedown in *Roe* is materially distinguishable from this case. In *Roe*, the plaintiff was at a protest with over 200 people present. *Id*. at *1. The protest had escalated such that officers were using tear gas and batons to arrest and disperse the crowd. *Id*. The comparison between the threat to officer safety in *Roe*, and the threat posed by one college student walking home alone with a beer is simply too attenuated.

Considering the relevant case law, a reasonable officer in Defendants' position would know that using substantial force for a nonviolent misdemeanor where there was no immediate threat to officer safety was unlawful. *Rice* and *Blankenhorn* placed the Defendants on notice that application of substantial force, without warning, by tackling a suspect to the ground is unreasonable in the absence of a threat to safety or serious criminal activity. Here, taken in the light most favorable to Plaintiff, the facts do not support qualified immunity.

***B. The Use of Handcuffs***

Plaintiff also argues that Defendants used excessive force because they handcuffed him too tightly. Handcuffs are commonly used for detention and arrests and usually constitute an acceptable amount of force with minimal intrusion to the suspect. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354-55 (2001) (finding use of handcuffs acceptable even if the crime is minor). Even so, the use of handcuffs can exceed this minimal intrusion and be held unconstitutional in some circumstances. *See, e.g.*, *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) (causing permanent nerve damage to arrestee when officers handcuffed him "extremely tight,"

picked him up by his handcuffed arms and threw him upside down and headfirst into patrol car); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (handcuffing was too tight and the officers refused to loosen them when the plaintiff complained).

At the outset, while the Court does not take Plaintiff's argument to be that the use of handcuffs, regardless of how tight they were, was excessive in this case, that is generally the starting point of the analysis. Plaintiff was under arrest; the use of handcuffs to effectuate that arrest was an acceptable use of force. Also, while the Court has found that a jury could conclude that the initial resistance by Plaintiff did not warrant the initial force used by Defendants, his continued resistance in the face of repeated warnings by Defendants that additional force would be used and that he was resisting arrest further warranted the use of handcuffs.

Plaintiff contends, though, that how Defendants used the handcuffs was excessive. When courts conclude that handcuffs involve more than minimal force, two common factors are pervasive: lasting, documented physical injuries and refusal by officers to loosen the handcuffs or otherwise provide medical assistance after receiving complaints that the handcuffs were too tight. *See, e.g.*, *LaLonde*, 204 F.3d at 960; *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (finding that fastening handcuffs so tightly they cause bruising to plaintiff's wrists and officer refusal to loosen them despite receiving complaints of pain can constitute excessive force). Neither of these circumstances is present here.

There is no evidence that Plaintiff suffered any documented physical injury to his wrists. Plaintiff does assert that he repeatedly told officers that his restraints, including the handcuffs, were too tight. Pl.'s Opp. 12. But, despite this assertion, the body worn camera footage does not show Plaintiff telling either Defendant Aarts or Defendant Roberts that the handcuffs were too tight. At one point, as he is being placed in the car, he says he is hurting but he does not specify

that it is from too tight handcuffs. Roberts BWC 7:15. During transport to the jail, Plaintiff told Officer Bunday, who is not a defendant, that his handcuffs were too tight. Bunday Decl., Ex. 1, 20:30-21:11 (Bunday BWC). However, by the time that Plaintiff made clear his complaint about the handcuffs, Defendants were not present or in any position to adjust his handcuffs. And Officer Bunday did adjust the cuffs once they were at the jail and he could safely do so. Bunday BWC at 38:00-41:50.

Based on the body camera footage, Defendants did not receive or ignore complaints about Plaintiff's handcuffs. The handcuffs, therefore, appear to be a minor use of force with minimal levels of intrusion. Plaintiff argues that whether the handcuffs were too tight—and as a result, whether the force was excessive—is for a jury to decide. But regardless of whether they were or were not, the question for the purposes of the qualified immunity analysis is whether a reasonable officer would have understood that the use of the handcuffs was excessive given the facts of this case. *Spencer*, 117 F.4th at 1138. The Court concludes the answer is no.

While it is clearly established that continuing to leave a detainee in handcuffs that are too tight can amount to excessive force, there is no evidence that Defendants were aware that Plaintiff's handcuffs were too tight during the arrest. The Court is aware of no case that requires an officer to check and loosen handcuffs absent a claim that the handcuffs were too tight, a request to loosen the handcuffs, or some evidence of damage or injury caused by the handcuffs that was visible to the officers. *Spencer*, 117 F.4th at 1138. Absent a case that "squarely governs" the facts in this case, the Court cannot conclude that such a right is clearly established. Defendants are entitled to qualified immunity as to the claim that the handcuffs were too tight.

### *C. Use of the Spit Hood and the Flexible Restraint Device*

Plaintiff also alleges that the use of the spit hood and the flexible restraint device (FRD) during his arrest was excessive. These two devices were not used during the initial takedown. Once Plaintiff was in handcuffs, attempts were made to move him into the back seat of a patrol car. During this process, he continued to resist and Defendant Roberts believed Plaintiff spit on him. Faced with an increased risk to their safety, Defendants responded with the spit hood and the FRD.

In this case, due to the risk of harm and degree of physical contact, the spit hood and FRD were intermediate uses of force with a substantial level of intrusion. Both are listed in the Eugene Police Department Use of Force Policy as applications of non-deadly force.[6] However, non-lethal force is not a "monolithic category" and as such the Court examines the "specific force employed in a specific factual situation." *Bryan*, 630 F.3d at 825. Important to this analysis is the nature and degree of physical contact and the risk of harm as well as the actual harm experienced. *Williamson*, 23 F.4th at 1152.

Spit hoods are placed over a suspect's head to prevent fluid transmission and are made of a mesh material so as not to "impede breathing or sight." Johnson Decl. Ex. 7. Although the use of the spit hood is a reasonable response to being spit on, the risk of harm is substantial. *Robinson v. Cnty. of Shasta*, 384 F. Supp. 3d 1137, 1159 (E.D. Cal. 2019) ("as the spit hood manufacturer warns . . . improper use may cause asphyxiation, suffocation or drowning in one's own fluids") (citation modified). The spit hood was placed on Plaintiff after he allegedly spit on

---

[6] Eugene Police Department Policy 800.3: "Any application of force that is not reasonably anticipated and intended under the circumstances to create a substantial likelihood of death or serious injury will be considered non-deadly force…. Non-deadly force applications may include… Policy 806 – Flexible Restraint Device…and Policy 811 – Spit Hoods."

Defendant Roberts. Roberts BWC at 05:20-05:24. But Plaintiff did not suffer any documented injuries from the use of the spit hood, and he was communicating clearly and without distress when he was in the back of the patrol car at the jail. *See, e.g.,* Bunday BWC 27:215-35:40; *id.* at 38:15-39:50.

FRDs are a type of hobble restraint, which are designed to restrict movement.[7] The FRD was used to clasp Plaintiff's feet together; it was then attached to his handcuffs behind his back. Defs.' Mot. 6. The FRD kept Plaintiff from kicking or having much control over his legs. Defs.' Mot. 6. The FRD requires considerable physical contact to place and can pose a substantial risk of harm to the suspect through asphyxiation. *See generally Gonzalez*, 163 F.4th at 1298 ("restraining a subject in a hogtied position raises that subject's risk of death through positional asphyxia). But, again, Plaintiff has not alleged he suffered documented injuries from its use.

These restraints were used because Defendants believed Plaintiff had kicked and spit on them during his arrest. The videos support this perception. The body camera videos in this case show Plaintiff moving his legs in a kicking motion and a bystander video shows he made contact with Defendant Aarts. Aarts BWC 1:12; Coen Poelmann MOV at 00:22-00:24. The body camera video also clearly shows Plaintiff screaming at Defendant Roberts and turning away from the police car that officers tried to place him in. Aarts BWC 4:54-5:04. Defendant Roberts believed Plaintiff spit on him and requested a spit hood in accordance with Eugene Police Department

[7] While there is no binding caselaw regarding FRDs, a similar device, a RIPP, is used in Arizona. *See Gonzalez*, 163 F.4th at 1294 ("A RIPP restraint is a type of hobble restraint meant to temporarily secure combative or violent subjects to prevent injury to the subject or officers and to minimize the opportunity for escape. A RIPP restraint consists of a nylon loop with a metal fastener or cinch on one end, a long strap extending from the loop, and a brass hook or latch at the end of the strap to connect to a subject's handcuffs.").

policy.[8] Roberts BWC at 05:20-05:24. After that, Plaintiff was taken to the ground for a second time. Roberts BWC at 05:19-05:24; Johnson Decl. Ex. 11. Plaintiff continued to struggle, and Defendants used the FRD alongside the spit hood to prevent Plaintiff from spitting on or kicking the officers.[9] Aarts BWC at 05:20-06:20.

No clearly established law prohibits the use of a spit hood in response to a person spitting on an officer. Indeed, the law is the opposite. *Allen v. Rivera*, 626 F. App'x 710, 712 (9th Cir. 2015); *see also Robinson*, 384 F. Supp. 3d at 1159-60. Similarly, the use of an FRD on a suspect who is actively resisting is permissible in certain circumstances. *Blankenhorn,* 485 F.3d at 479.

Plaintiff disputes that he kicked or spit on anyone. But even if Plaintiff did not intentionally kick an officer or spit in Defendant Robert's face, that is not dispositive for purposes of qualified immunity. The qualified immunity analysis focuses on what facts were known to Defendants at the time of the incident. *Spencer*, 117 F.4th at 1139 (noting that Plaintiff's subjective intent was not relevant and analyzing the video to examine the non-compliance).

Again, looking at the body camera video, it is clear that immediately before the spit hood and FRD were applied, Plaintiff was no longer just engaging in some limited resistance in response to some confusion about why he was under arrest. He had been handcuffed, told many times he was under arrest, and had seemingly calmed down and agreed to cooperate. But after

---

[8] Eugene Police Department Policy 811 dictates that "[a]ny subject who demonstrates spitting behavior… should have a department-issued spit hood placed over their head and face."

[9] While the use of force used in response to Plaintiff's kicking and spitting was in line with Eugene Police Department policy, Defendants' decision to escalate to physical force did not follow department policy on Use of Force. The policy states that when it is safe and objectively reasonable to do so, officers should make every reasonable effort to de-escalate confrontations. Johnson Decl. Ex. 8, at 1.

officers stood him up to move him to the patrol car, he started screaming and resisting again. He returned to the same behavior that had been told repeatedly would result in the FRD. And then Defendant Roberts believed he was spit on.[10] Given the way Plaintiff was screaming at the officers on the video, it is easy to see how an officer could have perceived that. It is at this point that Plaintiff is taken back to the ground and the spit hood and FRD were applied. Plaintiff was engaged in active resistance that put officers at immediate risk of harm, and they responded by using devices to minimize that risk. A reasonable officer would have perceived that as active resistance that permitted the use of additional force. *Spencer*, 117 F.4th at 1139-40. This was not a case like *Blankenhorn* were Plaintiff's response to an excessive tackle and arrest was to struggle for "several seconds" but was otherwise "restrained." 485 F.3d at 479-80.

Even if Defendants were ultimately mistaken about whether they were intentionally kicked or spit on, this mistake does not preclude a finding that they are entitled to immunity. *Pearson,* 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"). The question is whether a reasonable officer in that situation would have believed using both the spit hood and the FRD to prevent Plaintiff from continuing to kick or spit was "lawful under the clearly established principles of law governing that conduct." *Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1319 (9th Cir. 1995). The Court concludes a reasonable officer would have and Defendants are entitled to qualified immunity.

---

[10] There is no allegation that Defendant Roberts deliberately lied about being spit on and given the way Plaintiff was screaming "you're fired" it is easy to see how spit could have come from his mouth. Aarts BWC 4:53-4:58. Of course once Defendant Roberts announced he had been spit on, all of the other officers who were present would have reasonably believed the spit hood was permissible and would be entitled to qualified immunity. *Spencer*, 117 F.4th at 1145 (analyzing entitlement to qualified immunity individually).

## CONCLUSION

For the reasons listed above, the Defendants' motion for summary judgment is granted in part and denied in part. As to the initial takedown, Defendants are not entitled to qualified immunity, but as to the other allegations of excessive force, Defendants are entitled to qualified immunity.

IT IS SO ORDERED.

DATED this 17th day of August, 2026.

/s/Amy E. Potter
AMY E. POTTER
United States Magistrate Judge